# MAYER FERTILIZER & JUNK COMPANY *v.* VIRGINIA-CAROLINA CHEMICAL COMPANY.

TRADEMARKS; GOOD WILL; ASSIGNMENTS; EVIDENCE.

1. A trademark cannot be assigned or its use licensed, except as incidental to the transfer of the business or property in connection with which it has been used.

2. Good will is tangible only as an incident as connected with a going concern or business having locality or name, and is not susceptible of being disposed of independently.

3. The issuance of circulars by the user of a trademark applied to. fertilizers, to its customers, informing them of the transfer of its brands, and "that they could rely upon getting the same material under the same brand as they had been getting," does not constitute a transfer of the business and of the right to use the trademark.

4. The burden of proof is upon the junior party in a trademark interference, and all doubts must be resolved against him.

5. When the owner of a trademark abandons it, it becomes the subject of reappropriation by one who had theretofore used it, and he may register it.

No. 621. Patent Appeals. Submitted May 13, 1910. Decided June 1, 1910.

HEARING on an appeal from a decision of the Commissioner of Patents in a trademark interference proceeding.

*Reversed.*

The facts are stated in the opinion.

*Mr. Ralph Kalish, Mr. Louis Mayer,* and *Mr. Paul Finckel* for the appellant.

*Mr. Fred E. Tasker* and *Messrs. Oudin & Oakley* for the appellee.

Mr. Justice VAN ORSDEL delivered the opinion of the Court:

This is an appeal from the decision of the Commissioner of Patents in an interference proceeding involving the use of a design representing an anchor as a trademark for fertilizers. The Examiner of Interferences refused registration to both parties, which decision was reversed in part and affirmed in part by the Commissioner, who awarded the right to registration to appellee, Virginia-Carolina Chemical Company, and denied it to appellant, Mayer Fertilizer & Junk Company. Appellant's application was filed on May 8, 1905, and appellee's on March 6, 1906.

Appellee claims to have derived title to this mark through an assignment in 1888 from the Southern Fertilizing Company to the firm of Allison & Addison, appellee's immediate predecessor in business. It is conceded that the Southern Fertilizing Company began the use of the mark in 1873, a date long prior to that established by appellant. This assignment is attacked by appellant on the ground that it was a mere transfer of the right to use the trademark, unaccompanied by a sale of the business with which it was associated. "A trademark cannot be assigned, or its use licensed, except as incidental to a transfer of the business or property in connection with which it has been used." *Macmahan Pharmacal Co.* v. *Denver Chemical Mfg. Co.* 51 C. C. A. 302, 113 Fed. 468. This is too well settled to require further discussion or citation of authority.

The testimony shows that with the assignment, the good will of the Southern Fertilizing Company was also conveyed to Allison & Addison. It also appears that the Southern Fertilizing Company issued circulars to its customers, informing them of the transfer of its brands, and "that they could rely upon getting the same material under the same brand as they had been getting." It is insisted that this met the requirements of the law, and constituted a valid assignment of the mark. But the terms "good will" and "business" are not synonymous. Good will, like a trademark, is but an incident to, and can have no existence apart from, the business in which it had its origin.

"It is tangible only as an incident, as connected with a going concern or business having locality or name, and is not susceptible of being disposed of independently." *Metropolitan Nat. Bank* v. *St. Louis Dispatch Co.* 149 U. S. 436, 37 L. ed. 799, 13 Sup. Ct. Rep. 944.   In this case the Southern Fertilizing Company wound up its affairs and abandoned its business. Necessarily, its good will became extinct.   There was nothing ·tangible to which it might attach.   What is included under the term "good will" "varies almost in every case, but it is a matter distinctly appreciable, which may be preserved (at least, to some extent) if the business be sold as a going concern, but which is wholly lost if the concern is wound up, its liabilities discharged, and its assets got in and distributed." *Wedderburn* v. *Wedderburn, 22* Beav. 84.

The same requisites to a valid assignment of a trademark are essential to a valid transfer of the good will.   If, therefore, the assignment was insufficient to convey the right to use the trademark, it is without effect to transfer the good will.   "The good will of an establishment is an accessory thereto; separate therefrom, it is of no value.   And the same rule applies to trademarks."   Upton, Trademarks, 27.

Had the appellee's predecessor, Allison & Addison, manufactured the fertilizer sold by it under the tradename here in question, under the same formula, and from the same grade of material as that manufactured by the Southern Fertilizing Company, we might be confronted with a different case.   However, there is nothing in the evidence to this effect.   The circulars issued by the Southern Fertilizing Company, as testified to by the witnesses, stated such to be the case, but there is no sworn statement to prove that this was ever done, or even intended to be done at the time the circulars were issued.   One witness testified that Allison & Addison did receive from the Southern Fertilizing Company its formula and some raw material, but, on cross-examination, this witness admitted that he knew nothing of the transaction other than what he had heard.

Appellee is the junior party to this interference.   The testi-

mony offered on its behalf fails to overcome the burden thus resting upon it.

The purpose of the trademark law is as much for the protection of the public as for the manufacturer or dealer. The public has a right to know the origin of goods and commodities which it purchases. The public comes to recognize commodities designated by a particular mark as the product of a certain dealer, and as containing certain characteristics and qualities. If the owner of a mark be permitted to sell it, unaccompanied by the business by which it has become known to the trade, for use on goods of the same general class, but possessing different characteristics and qualities, one of the purposes of the law has failed and a fraud upon the public sanctioned.

We now come to a consideration of appellant's case. Appellant and its predecessors have been using the mark since, at least, 1880. The Southern Fertilizing Company abandoned it in 1888. Whether or not Allison & Addison began to use the mark immediately after its abandonment does not appear from the record. As appellee is the junior party, this doubt must be resolved against it. This brings us to the question, Should the application of appellant also be refused? The Examiner of Interferences held that, as appellant's predecessor adopted the mark while in use by the Southern Fertilizing Company, it could not appropriate it when abandoned by the latter company. This view is supported by the cases of *O'Rourke* v. *Central City Soap Co.* 26 Fed. 576, where the court said: "If it be once conceded that a person may acquire a good title to a trademark by appropriation, without the consent of the lawful owner, it would enable a manufacturer, by the use of large capital or superior energy, to drive competitors out of business by seizing their trademarks, and using them for that very purpose, provided the lawful owner is unable or unwilling to assert his rights by resort to the courts." With this statement of the law we are unable to agree. As long as the first appropriator is using the mark, the second acquires no property right therein. If his use interferes with that of the true proprietor, courts of equity afford the latter a swift and adequate remedy. We can-

not assume that one whose rights are invaded will not avail himself of such aid. If he is unwilling to do so, he must accept the consequences. When the owner abandons his mark, it becomes the subject of reappropriation and the property of the first taker. We fail to see why one already using the mark, where, as in this case, he has acted in good faith and without knowledge of its prior use, should not be as much entitled to appropriate it as one whose date of adoption is subsequent to the abandonment. Between the date of abandonment of the mark by the Southern Fertilizing Company and the date of adoption by Allison & Addison, appellant enjoyed the exclusive use of the mark. This, we think, amounted to a valid appropriation and entitles him to registration.

The decision of the Commissioner of Patents is reversed, and the clerk directed to certify these proceedings, as by law required.                                                *Reversed.*

Mr. Justice BARNARD, of the supreme court of the District of Columbia, sat with the court in the hearing and determination of this appeal, in the absence of Mr. Chief Justice SHEPARD.